DeLONG EQUIPMENT COMPANY,
Plaintiff–Appellant,

v.

WASHINGTON MILLS ABRASIVE COMPANY, et al.,
Defendants–Appellees.

No. 88–8664.

United States Court of Appeals, Eleventh Circuit.

Nov. 13, 1989.

William E. Sumner and David A. Webster, Sumner & Hewes, Atlanta, Ga., for plaintiff-appellant.

Paul Webb, Jr. and Philip S. Coe, Webb & Daniel, Atlanta, Ga., for defendants-appellees.

Before VANCE and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

ANDERSON, Circuit Judge:

Plaintiff-appellant DeLong Equipment Company ("DeLong") brought this action against Washington Mills Abrasive Company, its wholly-owned subsidiary Washington Mills Ceramic Corporation (collectively referred to as "Washington Mills" unless otherwise noted), B.C.S. Company, Inc. ("BCS"), and several individuals alleging violations of the federal antitrust laws as well as pendent state law claims. The district court granted partial summary judgment in favor of the defendants, and DeLong appeals. Because we find that DeLong has raised genuine issues of material fact regarding several issues, we reverse and remand the case for trial.

## I. BACKGROUND

### A. *Facts*

Plaintiff DeLong, a Georgia corporation wholly owned by Harold DeLong, is a distributor of vibratory equipment and supplies used to polish and deburr metal parts in industrial manufacturing processes. The key product in this process is an abrasive metal finishing substance known as "media." In the manufacturing process, metal parts for products such as automobiles or airplanes are cut from sheets of metal and placed in vats or tubs containing media. The containers are then vibrated, causing the media to rub against the metal parts, removing any rough edges and giving the piece a polished finish.

Finishing media can be readily available natural products such as corn cobs or sand, or can be specialized products such as liquid chemicals, glass beads, steel balls, ceramic shapes, or plastic chips. The media in this case is known as "preformed ceramic media," and is used, among other things, in the manufacture and refurbishing of jet aircraft engine blades. Preformed ceramic media consists of a blend of clays, sands, and polishing agents which is extruded through metal molds of different shapes, such as cylinders, stars, rectangles, or triangles, cut into the desired size, baked and dried. The material is packed by the manufacturer and shipped either to distributors or directly to end-user customers by common carrier. The role of the distributor is to consult with the user of media and to advise the user of the appropriate equipment, media, vibratory power, speed, and time period.

Washington Mills Abrasive Company, located in North Grafton, Massachusetts, has been in the abrasive finishing business since 1868. Washington Mills is a manufacturer-supplier and occasional distributor of media.[1] Washington Mills's media is manufactured by its wholly-owned subsidiary, Washington Mills Ceramic Corporation, located in Lake Wales, Florida. Washington Mills approved DeLong as a distributor in September 1982.[2]

Defendant BCS, located in Thompson, Connecticut, is also a distributor of media, engaged in a business virtually identical to DeLong's. BCS has been a distributor of

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Washington Mills sells its media primarily through its network of distributors. It does sell some media directly to end-user customers, but it is undisputed that such sales occurred only infrequently and outside Washington Mills's usual course of business during times relevant to this litigation.

2. DeLong has been engaged in the sale and distribution of vibratory equipment and media for over twenty years, primarily in Georgia, Alabama, and South Carolina.

Washington Mills products since the early 1980s, and was Washington Mills's primary distributor in the northeast during all times relevant to this litigation.[3] Neither De-Long nor BCS manufacture media, but both distribute media manufactured by others, including Washington Mills.

As was its customary practice, Washington Mills did not enter into a written distributorship agreement with DeLong. Generally, Washington Mills distributors purchased media for resale at a wholesale discount of 25% off the list price for media. There was no provision in the arrangement between Washington Mills and DeLong for exclusive territories or franchise areas, and Washington Mills's distributors competed, sometimes vigorously, for end-user customer accounts. As a distributor of Washington Mills products, DeLong, along with all other Washington Mills distributors, received a standard price list showing the size, shape, composition, and price per pound for each kind of "stock" media regularly kept in Washington Mills's inventory. The price list also provided that customers could request specially made media, subject to minimum volume requirements and a requirement that the customer pay for a new die if one was required to produce the media. This "special" media was manufactured at the request of three or fewer customers without sufficient volume to be placed in regular inventory. "Special" media is not an inherently different product from Washington Mills's "stock" media or from media manufactured by other companies.

Defendant Peter Williams is the president and controlling shareholder of Washington Mills. Defendant John Williams, no relation to Peter, is general sales manager of Washington Mills as well as an officer of the corporation. Defendant Hans van der Sande was Washington Mills's southeast regional sales manager[4] during the time material to this action. He was responsible for processing orders and arranging shipments to distributors, and also dealt with distributor complaints. Defendant Robert Baldauf was regional sales representative for Washington Mills in the southeast. Baldauf visited dealers, ascertained their product needs, and transmitted this information to van der Sande at Washington Mills's home office.

Pratt & Whitney Aircraft Division of United Technologies Corporation ("Pratt") is not a party to this action, but its role has been crucial throughout. Pratt is one of Washington Mills's largest end-user customers. Pratt manufactures aircraft engines, and ceramic preformed media are used in the production of jet engine blades. Pratt's engineering department tests and approves the use of certain materials in its manufacturing process and issues specifications used by its purchasing department in soliciting bids for these products. These specifications appear on product material control dockets, or "PMCs." Except for extraordinary situations not relevant here, Pratt's purchasing department may only purchase items specified on the PMCs, and materials delivered to Pratt must have the PMC number stamped on the box. PMCs are important to Pratt because it wants to ensure that both the product which was tested and the supplier of that product remain constant. Pratt considers the PMC number an attestation that the product is identical to the product that Pratt approved for its manufacturing process. Pratt not only buys media for its manufacturing of jet engine blades, but also instructs other companies purchasing Pratt engines to use the same media in refurbishing engine blades.

In the late 1970s and early 1980s, Pratt was planning a new production facility. Initially the facility was to be located in the northeast, but Pratt ultimately built the plant in Columbus, Georgia in 1983. In the years preceding Pratt's construction of its Columbus facility, Pratt engineers in Connecticut had engaged in a business relationship with BCS. BCS was a supplier of

---

**3.** BCS was dismissed as a party to this action after settlement.

**4.** Florida, Georgia, Alabama, Mississippi, Tennessee, North Carolina, South Carolina, and eastern Arkansas comprised Washington Mills's southeast sales region.

tumbling media and other products to Pratt's East Hartford, Connecticut plant at that time. Defendants William Biebel and his son, Robert Biebel, were the principals of BCS who dealt with Pratt's engineers. During Pratt's development process of a new jet engine to be manufactured in Georgia, BCS helped Pratt test vibratory equipment and tumbling media until a satisfactory process was found. After testing media from several manufacturers, including Washington Mills, James Neil, a Pratt engineer, requested that a PMC be issued for three of the Washington Mills media furnished by BCS during the development process.

This PMC specified BCS as the "manufacturer" of the media, and identified various media as "BCS Specials." William Biebel of BCS testified that BCS tried to have an end-user customer approve a product with the BCS label rather than the manufacturer's label. This labeling ensured that BCS would retain the sales of the product and not be undercut by a competing distributor of the same media.

Initially, Washington Mills distributed its media to Pratt's Columbus plant through BCS. Pratt required a twenty-four hour commitment for delivery to the Columbus plant, however, and BCS did not have facilities nearby to service the plant properly. When it became aware of BCS's inability to service Pratt in Columbus, DeLong became attracted to the lucrative account.

DeLong received an invitation to bid in 1982 which listed BCS as the manufacturer of the media, and DeLong informed Pratt that BCS did not manufacture media but was a distributor like DeLong. Harold De-Long asked for a sample of the media in question, and his examination of the media suggested that it was stock media manufactured by Washington Mills. DeLong repeatedly complained to Washington Mills that the higher priced media being sold to Pratt was exactly the same as Washington Mills's stock media, and that therefore the price should have been lower.

DeLong made a bid in response to Pratt's 1982 invitation, and was the successful bidder. DeLong leased a warehouse in Columbus, and supplied Washington Mills's media to Pratt until Washington Mills terminated its distributorship in August 1985.

### B. *Procedural History*

After being terminated by Washington Mills, DeLong brought this action in February 1986, alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; section 2 of the Clayton Act as amended by section 1 of the Robinson–Patman Act, 15 U.S.C. § 13(a); section 3 of the Clayton Act, 15 U.S.C. § 14; and various violations of Georgia law, including breach of contract, tortious interference with business relationships, fraud, deceit, and misrepresentation.

In its complaint, DeLong alleged, *inter alia,* that it was terminated for failing to participate in a scheme between Washington Mills and BCS to fix the price of media, particularly media sold to Pratt. Washington Mills asserted that it terminated De-Long's distributorship because DeLong's employees were abusive to Washington Mills personnel and DeLong was behind in its payments. DeLong also alleged that after it was terminated by Washington Mills, Washington Mills used customer lists and other information to attempt to dissuade DeLong customers from continuing to deal with DeLong.[5] DeLong's customer lists were available to Washington Mills because shipments from Washington Mills's manufacturing site in Lake Wales, Florida, were "drop shipped" directly to DeLong's customers.

The district court dismissed defendants Robert Biebel, William Biebel, and BCS for lack of personal jurisdiction. This court affirmed the dismissal of William, but reversed the dismissal of Robert and BCS. *DeLong Equipment Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843 (11th Cir. 1988). On remand after extensive discovery, the district court granted the re-

---

**5.** The parties have entered into court-approved protective orders to protect confidential custom- er information in this litigation.

maining defendants' motion for summary judgment on all counts except some aspects of DeLong's Robinson–Patman Act count. *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, No. 1:86–CV–275–GET (N.D.Ga. June 16, 1988) ("District Court Order"). The district court certified its grant of summary judgment under Fed.R. Civ.P. 54(b), and this appeal followed.

### C. *Standard of Review*

This court reviews the district court's grant of summary judgment *de novo. McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1492–93 (11th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). Summary judgment is appropriate only if the pleadings and evidence in the record demonstrate that there is no genuine issue of material fact as to any issue and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). On summary judgment, the reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), *quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The nonmoving party, however, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514, and must show "that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Dunnivant v. Bi–State Auto Parts*, 851 F.2d 1575, 1579 (11th Cir. 1988).

■ It is the substantive law, however, that identifies those facts that are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The Supreme Court recently has endorsed the use of summary judgment in antitrust cases in order to avoid chilling legitimate competitive behavior, *Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360; *McGahee*, 858 F.2d at 1493, and has articulated specific rules which make summary judgment more readily available in cases alleging violations of section 1 of the Sherman Act. *H.L. Hayden Co. of New York v. Siemens Medical Systems*, 879 F.2d 1005, 1012 (2d Cir.1989). We address those rules more fully in the context of our discussion of DeLong's section 1 claim.

## II. SHERMAN ACT CLAIMS

### A. *Applicable Law*

The first count in DeLong's complaint alleges a conspiracy in violation of section 1 of the Sherman Act.[6] DeLong contends (1) that the defendants conspired to fix prices of media sold to Pratt by designating ordinary media as "special" media and selling it at an artificially inflated price to Pratt; and (2) that DeLong's distributor relationship with Washington Mills was terminated in furtherance of that conspiracy.

■ Restraints on competition that may violate section 1 fall into two broad categories, horizontal and vertical. Vertical restraints occur between entities at different levels of distribution in order to control the price or path of a product after the product leaves the manufacturer, while restraints between competitors at the same level of distribution are characterized as horizontal. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, ——, 108 S.Ct. 1515, 1522–23, 99 L.Ed.2d 808 (1988). While the boundary between vertical and horizontal restraints is sometimes unclear, *see Business Electronics*, 485 U.S. at —— n. 4, 108 S.Ct. at 1528 n. 4 (Stevens, J., dissenting), it is undisputed that the termination of DeLong, a distributor, by Washington Mills, a manufacturer, poses a verti-

---

**6.** Section 1 of the Sherman Act, in pertinent part, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

DeLong also alleged violations of section 2 of the Sherman Act and section 3 of the Clayton Act. The district court granted summary judgment in favor of the defendants on these claims, and DeLong has not contested that ruling on appeal.

cal restraint problem. District Court Order 10; *Valley Liquors v. Renfield Importers,* 822 F.2d 656, 660 n. 5 (7th Cir.) ("[a]lleged price fixing between a manufacturer and distributors [is] properly termed a 'vertical' conspiracy"), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *see Construction Aggregate Transport v. Florida Rock Industries,* 710 F.2d 752, 778 (11th Cir.1983) ("key inquiry when determining whether a particular arrangement is horizontal or vertical is not the presence of a conspirator on the plaintiff's market level ('horizontal' to the plaintiff) but whether the conspiratorial agreement is *between* entities which are *horizontally arranged* at some level in the market") (emphasis in original) (footnote omitted).[7]

■ Vertical restraints may be price or non-price in nature. Supreme Court decisions from *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), to *Business Electronics* have left the area of vertical price restraints relatively settled. Express agreements or practices implying an agreement to maintain resale prices are *per se* illegal under section 1 of the Sherman Act. As the Court recently reaffirmed in *Business Electronics,* "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." 485 U.S. at ——, 108 S.Ct. at 1525.

■ *Per se* rules of illegality are the exception in antitrust analysis and are appropriate only when they relate to conduct that is manifestly anticompetitive. *Business Electronics,* 485 U.S. at ——, 108 S.Ct. at 1519. As the Court explained in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), "there are certain agreements or practices which because of

their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Since the Court decided *Dr. Miles* in 1911, vertical price agreements have been deemed to have such a pernicious effect on competition that *per se* illegality is warranted.[8]

The Court in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 760–61, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984), set forth the legal standard governing distributor termination cases:

> This Court has drawn two important distinctions that are at the center of this and any other distributor-termination case. First, there is the basic distinction between concerted and independent action—a distinction not always clearly drawn by parties and courts. Section 1 of the Sherman Act requires that there be a 'contract, combination ... or conspiracy' between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); cf. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Under *Colgate,* the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.

**7.** The Supreme Court has expressly rejected the possibility, suggested by DeLong, that this vertical conduct can be construed as horizontal because some of its effects may be horizontal. *Business Electronics,* 485 U.S. at ——, 108 S.Ct. at 1523 n. 4.

**8.** Recent vertical restraint decisions indicate that the Supreme Court now requires a higher threshold of proof of joint action in a vertical

price fixing case in order to invoke *per se* illegality, not a relaxation of the settled rule that vertical price agreements are *per se* illegal. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 760–61, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (reaffirming rule that vertical price restraints are *per se* illegal while non-price restrictions are subject to the rule of reason).

The second important distinction in distributor-termination cases is that between concerted action to set prices and concerted action on nonprice restrictions. The former have been *per se* illegal since the early years of national antitrust enforcement. See *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 404–409, 31 S.Ct. 376, 383–385, 55 L.Ed. 502 (1911). The latter are judged under the *rule of reason, which requires* a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition. See *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

465 U.S. at 760–61, 104 S.Ct. at 1469 (footnote omitted).

 Under the rule of reason, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *GTE*, 433 U.S. at 49, 97 S.Ct. at 2557. The burden of proving unreasonable effects on competition in a rule of reason case rests with the antitrust plaintiff. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 380 (5th Cir. 1977).[9] Among other things, this means that the plaintiff must allege and prove that the defendants' conduct had a significant anticompetitive effect in a defined product market. *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 422–23 (11th Cir.1984); *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560, 1573 (11th Cir.1983); *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979).

 The district court concluded that the restraints at issue here were non-price in nature, and hence applied a rule of reason analysis. District Court Order 10–11. The court misconceived DeLong's position and focused on the indirect effect on price which the termination of the DeLong distributorship may have had. The court, applying the rule of reason, held that DeLong had not carried its burden of defining a relevant market and granted summary judgment to defendants accordingly. On appeal, DeLong candidly concedes that it has not alleged and cannot prove the facts required to establish a prima facie rule of reason case under the law of this circuit.[10]

 In order for DeLong to prevail on this appeal, then, it must demonstrate that genuine issues of material fact exist as to vertical price agreements which would be *per se* illegal under section 1. We believe that the district court's conclusion that the alleged restraints were nonprice in nature overlooked evidence of a conspiracy to fix the price of media sold to Pratt; we conclude that DeLong has presented sufficient evidence of a vertical *price* conspiracy to survive defendants' motion for summary judgment.[11] DeLong has

**9.** This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**10.** DeLong attempts to circumvent the factual showing of market power and diminution of competition required under the rule of reason by citing *NCAA v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Once an antitrust plaintiff has adduced evidence demonstrating defendants' imposition of price restraints, according to DeLong, *NCAA* stands for the proposition that the defendants must come forth with "some competitive justification even in the absence of a detailed market analysis." 468 U.S. at 109–10 n. 42, 104 S.Ct. at 2964–65 n. 42. Under this interpretation of *NCAA,* DeLong contends that because it has shown a "naked restriction on

price" within the meaning of *NCAA,* it is not required to adduce evidence of market power.

This is a tortured reading of *NCAA.* In *NCAA,* the fact that the NCAA possessed power in the collegiate sports television market was obvious. The thrust of the Court's discussion upon which DeLong relies is actually to the effect that where "[a]s a factual matter, it is evident that petitioner does possess market power," 468 U.S. at 111, 104 S.Ct. at 2965, a lengthy economic analysis of market power is unnecessary. DeLong has made no showing that Washington Mills's market power, if any, is "evident," and therefore DeLong's argument based on *NCAA* is without merit.

**11.** A conspiracy to artificially inflate or "pad" the price is a conspiracy to affect "price or price levels." *Business Electronics,* 485 U.S. at ——, 108 S.Ct. at 1525; *County of Oakland v. City of*

presented substantial evidence, creating genuine issues of material fact, of a conspiracy to fix the price of media sold to Pratt and termination of DeLong's distributorship pursuant to the conspiracy.[12] We now turn to that evidence.

### B. *DeLong's Allegations of a Vertical Price Conspiracy*

■ In order to survive the defendants' motion for summary judgment, DeLong must adduce facts that tend to show a conspiracy to set prices and that DeLong was terminated pursuant to that conspiracy.[13] Antitrust law, however, "limits the range of permissible inferences from ambiguous evidence" in a case under section 1 of the Sherman Act. *Palmer v. BRG of Georgia, Inc.*, 874 F.2d 1417, 1422 (11th Cir.1989). In *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court set forth the standard by which to judge the sufficiency of the evidence of an agreement to restrain trade in a dealer termination case:

> [T]here must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

465 U.S. at 768, 104 S.Ct. at 1473. In *Matsushita Electric Industrial Co. v. Ze-*

*nith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court held that a non-moving party who seeks to defeat a summary judgment motion "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" the non-moving party. 475 U.S. at 588, 106 S.Ct. at 1356–57. The summary judgment standard in vertical restraint cases is more stringent than in other areas of antitrust law because a higher possibility of capturing and invalidating legitimate business conduct exists. In *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530 (11th Cir.1987), this court combined the *Monsanto* and *Matsushita* rules into a two-part test applicable to distributor termination cases where the plaintiff alleges that it was terminated due to a collusive price-fixing agreement between a manufacturer and its distributors:

> First, the plaintiff must satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one. *Matsushita* dictates that if the alleged conspiracy is economically infeasible or irrational then, as a matter of law, summary judgment must be entered against the plaintiff. Second, the plaintiff in a distributor-termination case must also be able to point to evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor. Mere com-

---

Detroit, 866 F.2d 839, 841, 850 (6th Cir.1989); *National Marine Electronic Distributors v. Raytheon Co.*, 778 F.2d 190, 193 (4th Cir.1985) (in order to conspire to restrain resale price competition there must be "some agreement to set, control, fix, maintain, or stabilize prices"). Washington Mills does not argue otherwise.

**12.** DeLong also alleged that Washington Mills illegally divided market territories and specific customers among its distributors, and that DeLong's failure to respect those divisions was another factor leading to its termination in August 1985. Territorial restrictions, *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 422 n. 13 (11th Cir.1984), and exclusive dealing arrangements, *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 711 (11th Cir. 1984), are nonprice vertical restraints and therefore reviewed under the rule of reason. *GTE,*

433 U.S. at 49, 97 S.Ct. at 2557. Because DeLong concedes that its evidence is insufficient to sustain rule of reason scrutiny, *see supra,* we need not address these contentions.

**13.** The district court assumed for summary judgment purposes, but did not decide, that DeLong presented sufficient evidence of joint action. District Court Order 10. It did not need to reach the issue of whether a vertical agreement existed because it characterized the restraints at issue as nonprice in nature and therefore applied a rule of reason analysis. Because we believe that the restraints at issue are more appropriately characterized as vertical *price* restraints, *see supra,* we must address the question whether DeLong has presented sufficient evidence of conspiracy to survive a motion for summary judgment.

plaints from other competing distributors are not sufficient in this regard since they are equally consistent with both an independent and a collusive interpretation. The distributor must, instead, adduce positive evidence which tends to exclude the possibility of unilateral action.

818 F.2d at 1534 (footnote omitted).

We need not pause long at the first *Helicopter* requirement—the conspiracy DeLong alleges is eminently reasonable. BCS, Washington Mills, and DeLong (if it participated) all stood to gain economically by this arrangement. If DeLong's version of events is true, BCS in fact received its portion of the benefits of the scheme in the form of payments to its offshore affiliate, Wood & Thompson, which we discuss below. Termination of a distributor, DeLong, who refused to participate in the scheme is also economically reasonable. This case does not involve economically questionable behavior such as the predatory pricing scheme at issue in *Matsushita. See Winn v. Edna Hibel Corp.*, 858 F.2d 1517, 1520 (11th Cir.1988).

In order to satisfy the second prong of the *Helicopter* inquiry, DeLong must show evidence of concerted action. This evidence "need not be such that *only* an inference of conspiracy may be derived from it. It must, however, go beyond equivocal complaints and *tend* to exclude the inference of independent action." *Helicopter*, 818 F.2d at 1534 n. 4 (emphasis in original). We must determine whether a reasonable trier of fact might conclude from the evidence presently before us that Washington Mills and BCS engaged in an illegal conspiracy in restraint of trade. *See Helicopter*, 818 F.2d at 1535 n. 5. We believe that DeLong has satisfied its burden. We now turn to specific evidence adduced by DeLong that tends to show (1) that Washington Mills and BCS conspired to add a premium to the price of "special" media going to Pratt, although that media was identical to stock media; and (2) that DeLong's distribution arrangement with Washington Mills

was terminated in furtherance of that conspiracy.

### 1. BCS/Washington Mills Conspiracy

### (a) Evidence that "Special" Media was Identical to "Stock" Media

DeLong's allegations of a vertical price conspiracy center on the sale of media to Pratt. DeLong argues that BCS and Washington Mills conspired and combined to inflate the price of Washington Mills's standard media by labeling it "special" and charging Pratt a significantly higher price than Washington Mills's list price for identical media. The Washington Mills media sold to Pratt was designated as "special," and was assigned numbers indicating its intended use. DeLong adduced evidence that this "special" media was actually "generic" media; i.e., media that Washington Mills regularly produced and carried in stock, and that special media did not differ in size, shape, or composition from the media regularly stocked by Washington Mills. The increased price charged by Washington Mills for this product, DeLong asserted, was not justified by any cost differential.

The defendants now admit that the "special" media is not inherently different from Washington Mills's stock media. The media manufactured by Washington Mills for Pratt was "special" media known as P & W 5000, P & W 6000, and P & W 7000.[14] The defendants claim that these products were not listed on the price list nor carried in Washington Mills's regular inventory and that Washington Mills exercised a higher degree of quality and inventory control over the media sold to Pratt. However, two of these products, P & W 6000 and P & W 7000, are identified as stock media on Washington Mills's June 1983 and April 1982 price lists.

The stock items were sold to distributors at sixty-six cents per pound, less the twenty-five percent discount. Except for a few instances, the details of which are in dispute, Washington Mills quoted DeLong a

---

**14.** P & W 5000, PMC 3175–1, is a $\frac{7}{8} \times \frac{7}{8}$ tetrahedron pyramid, 20 bond. P & W 6000, PMC 3179–1, is a $\frac{5}{8} \times \frac{5}{8}$ angle-cut triangle, 25 degrees, 20 bond. P & W 7000, PMC 3178–1, is a $\frac{5}{8} \times \frac{1}{4}$ angle-cut triangle, 25 degrees, 20 bond.

wholesale price of eighty-five cents per pound for each of the Pratt items.[15] P & W 5000 is not listed on a stock Washington Mills price list, but Washington Mills records suggest that this item was carried in inventory at all times and sold to customers other than Pratt. Moreover, Washington Mills has sold all three types of "Pratt" media to other customers, and a BCS employee has stated that the only difference between such media sold to Pratt and to other customers is the labeling, i.e., the PMC number stamped on the Pratt boxes. (Robert Biebel Dep. 121-28). DeLong also points to at least two instances where Washington Mills shipped media directly to Pratt in boxes which only carried the PMC number required by Pratt, and did not identify the manufacturer of the media as Washington Mills.

DeLong has made a strong showing that the so-called "special" media (sold at a high price of eighty-five cents per pound) was identical to media carried in Washington Mills's regular inventory and sold to other customers at lower prices. There is at least a genuine issue of fact as to whether the "special" media is identical to the lower priced stock media.

(b) Atlanta Meetings and Other Evidence of Agreement to Fix Price

In early October 1984, Hans van der Sande and Robert Baldauf of Washington Mills met with Robert Biebel of BCS in Atlanta to discuss "the PW situation in Columbus," and visited Pratt's Columbus plant. (Pl.Ex. 200). At this point, BCS was no longer selling media to the Columbus plant. During that meeting, however, the fact that BCS was willing to turn the Pratt Columbus account over to Washington Mills for direct sales was discussed. Van der Sande's report of that meeting stated that Biebel said he has "several good friends at P & W," who "take trips on his boat to the Bahamas and give him an edge over competition." (Pl.Ex. 191). The record indicates that BCS did provide Caribbean trips on its corporate boat for certain Pratt employees, including James Neil, Moe Dahill, and Dave Dawson, all of whom were responsible, to varying degrees, for testing and approving media.[16]

There was also evidence that BCS worked with its contacts at Pratt to develop the Washington Mills media used at the Columbus plant. Although the extent of their collaboration remains disputed, it was undisputed that Washington Mills and BCS coordinated their activities in developing the media for Pratt.[17]

Regarding the October 1984 trip to the Columbus plant, van der Sande's report stated that "[w]e had a great visit, inside sources confirmed to Bob [Biebel] that the Pratt people were impressed by our visit. We were given (special permission) to visit the actual manufacturing facilities." (Pl.Ex. 192, van der Sande Dep. 39). The report also stated: "his [Biebel's] friend Jim at the Columbus plant makes sure which media does or does not work." (Pl.Ex. 191).

15. The eighty-five cent price was the price quoted to the distributor, which then would mark up that price for resale to Pratt. DeLong's initial successful bid to Pratt was $1.11 per pound for PMC 3175-1 and 3179-1 and $1.13 for PMC 3178-1. The exact prices paid for "special" media during the course of DeLong's relationship with Washington Mills are a subject of dispute between the parties, but it is clear that at all times the media sold to Pratt was priced substantially higher than Washington Mills's standard media.

16. DeLong contends that Washington Mills gave BCS employees, particularly Robert Biebel and William Biebel, free Caribbean vacations. There does not appear to be evidence in the record suggesting that Washington Mills gave trips to BCS people.

17. DeLong alleges that Lawrence W. Bates, a former Pratt employee, was a key player in the arrangement between BCS and Pratt. Bates worked for Pratt for 37 years, retiring in 1977. Bates then went to work for BCS as a salesman responsible almost exclusively for the Pratt account in Connecticut. Contrary to DeLong's assertions, Bates retired several years before the Washington Mills media was approved by the Columbus plant, and thus he could not have personally issued the PMCs in question. Undoubtedly, his contacts at Pratt were advantageous to BCS, but our review of the record indicates that his role was not as instrumental as DeLong suggests. Bates testified that he did not deal with the Columbus plant at all.

The foregoing evidence supports De-Long's allegations of joint action between Washington Mills and BCS in regard to media sales to Pratt. The evidence suggests that BCS had contacts at Pratt which could provide an incentive for Washington Mills to coordinate with BCS in its dealings on the Pratt account, and that the two companies did in fact act jointly with respect to the Pratt account.

On the day following the October 1984 trip to the Columbus plant with BCS officials, van der Sande made a routine sales call on DeLong, who was actually servicing the Pratt account at the time. Van der Sande did not mention his visit the day before to the Columbus plant. In van der Sande's report of that meeting dated October 10, 1984, he stated that DeLong was "not very happy with BCS, and P & W.... Harold does not play with a full deck either.... He is not all wrong about the B.C.S. situation, long term it may not work. Bob Bieble [sic] feels we are secure for at least 3 years unless Delong [sic] does not play the game." (Pl.Ex. 194).

The evidence that Washington Mills and BCS had worked together in developing the Pratt media; that the Pratt media was priced at a premium though it was in fact identical to generic media; that BCS's contacts at Pratt provided an incentive for joint action; that Washington Mills and BCS were continuing to work together on the Pratt account during the October, 1984 plant visit, long after DeLong had replaced BCS as the Pratt distributor; and that Washington Mills and BCS were conversing in October, 1984 about the good prospects for continuing the Pratt arrangement unless DeLong refused to "play the game" —all support DeLong's assertion that Washington Mills and BCS had agreed to "pad" the price of the Pratt media.

 (c) "Commissions" from Washington Mills to a BCS Affiliate

DeLong presents additional, and more compelling, evidence of joint action between Washington Mills and BCS. Washington Mills paid Wood & Thompson, a Bahamian corporation which owned most of BCS's stock at the time, funds which were tied to sales of media to Pratt.[18] The payment of these funds, which amounted to approximately $50,000, is not in dispute. The payments were based on 15% of the wholesale selling price of media to Pratt and lasted for approximately two years after BCS ceased servicing the Columbus plant.

The defendants claim that this money was compensation for technical work done by BCS and for BCS's work in getting Washington Mills's product approved by Pratt, even though BCS no longer sold media to the Columbus plant. Such an "override" was not customary; in fact the evidence shows that Washington Mills had never paid such a commission to any other distributor. Defendants claim that the Pratt situation was so complex that additional compensation to BCS was justified.

DeLong claims that these "commissions" actually represented BCS's share of the inflated price Pratt paid for media. To support its argument, DeLong points to testimony by James Neil, a supervisor in the engineering group at Pratt who was instrumental in issuing the PMCs for the media at issue in this case. Neil worked closely with BCS from 1981 through 1983 and considered Robert Biebel to be a friend of his. Neil testified that he worked with Robert Biebel on testing of media, and that Biebel was compensated for this testing at the time it was performed. Biebel and BCS were compensated for testing directly, not through later sales of media to Pratt. Robert Biebel testified, however, that BCS was not paid for its 1979–83 testing and development of media for Pratt.

---

**18.** Prior to 1982, William and Robert Biebel owned all of BCS's stock. In 1982, they sold their interest in BCS to Malin, Kilrea & Larne, a Hong Kong corporation. Malin, Kilrea and Wood & Thompson are related corporations. During the time Malin, Kilrea owned BCS, BCS regularly paid "management fees" to Malin, Kilrea, which evidently were used to fund personal annuities for William Biebel and Robert Biebel. The payments from Washington Mills directly to Wood & Thompson served as these fees. BCS also made a $50,000 "loan" to Wood & Thompson which was never repaid.

This testimony, along with other evidence in the record, demonstrates that genuine issues of material fact exist as to the precise nature of the payments from Washington Mills to BCS. Defendants call it compensation for their work on "developing" the Pratt account, while DeLong claims that it is merely Washington Mills passing on to BCS the benefits of the inflated price, because BCS was integral in setting up the scheme. A jury reasonably could infer that Washington Mills desired to enter into an agreement with BCS to exploit BCS's contacts with key Pratt people, and agreed to pay the commissions to BCS's offshore sister corporation, Wood & Thompson. A jury also could conclude that the Wood & Thompson "commissions" demonstrate that Washington Mills and BCS agreed on the "pad" to the price. The amount of the commissions was linked to the sale price of media to Pratt, and there is a reasonable inference that the "commissions" were a means for BCS to share in the "pad" by which the price was inflated.

Viewing the totality of this evidence in the light most favorable to DeLong, which we must, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), a jury reasonably could conclude that Washington Mills and BCS worked together to develop "special" media for sale to Pratt and agreed to sell it at an inflated price. The meeting between BCS and Washington Mills officials in Atlanta, the trip to Pratt's Columbus plant, gratuities from BCS to key Pratt people, and the "commissions" paid by Washington Mills based on a percentage of the price of media sold to Pratt–all reasonably tend to support DeLong's conspiracy allegation.

## 2. DeLong's Termination in Furtherance of the Conspiracy [19]

### (a) DeLong Confronts Washington Mills

Before DeLong began supplying media to Pratt, the relationship between DeLong and Washington Mills appears to have been good. From the earliest sales of Washington Mills's "special" media to Pratt, however, DeLong was concerned. A DeLong employee stated that no Washington Mills ceramic media had ever been so expensive, and Harold DeLong feared that competing distributors were being quoted a lower price. On multiple occasions throughout 1983, 1984, and 1985, Harold DeLong and his employees directly confronted Washington Mills with their belief that the "special" media was identical to stock media. DeLong was told that the Pratt media was "special" and that it could not purchase the media at the stock price listed on Washington Mills's general price list, but DeLong did not believe the Washington Mills personnel.

DeLong pressured Washington Mills to sell it generic media to resell to Pratt. DeLong sought to have Washington Mills apply the PMC number to boxes of stock media and ship it to Pratt at the stock price, but Washington Mills refused to do so. Robert Baldauf, a Washington Mills employee, visited DeLong's Atlanta offices in May 1985 to discuss the Pratt & Whitney pricing situation. This was just a few months before DeLong was terminated. When Harold DeLong and Dan Dickey, the DeLong salesman primarily responsible for the Pratt account, confronted Baldauf with their assertions that the so-called "special" media was in fact Washington Mills's stan-

**19.** In addition to the evidence discussed in the text, DeLong contends that complaints by dealers other than BCS about DeLong's pricing practices led to its termination. After it began selling Washington Mills products in 1982, DeLong was an aggressive seller and converted many end-users to Washington Mills media. DeLong's aggressive sales practices also engendered complaints from competing Washington Mills distributors. Corrosion Specialties, Inc., Paschal Associates, Inc., and BRW Quality Metal Finishing, Inc. all complained to Washington Mills that DeLong was underbidding them, and BRW suggested that DeLong's distributorship be terminated. Washington Mills did not act immediately on this request, but rather issued an "open letter" to certain distributors detailing problems with inter-distributor selling.

This evidence is not sufficient to show concerted action between Washington Mills and its other distributors to terminate DeLong. The Supreme Court has held that in a distributor termination case, "something more than evidence of complaints [by other distributors] is needed" for a plaintiff to survive a motion for summary judgment. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. We address that "something more" in the text.

dard 20–bond composition, Baldauf replied that Hans van der Sande handled that situation and that, in any event, the media sold to Pratt contained diamond dust. DeLong suspected that the "special" media was stock media and did not contain diamond dust, but he could not absolutely confirm his suspicions. Baldauf denied telling any DeLong employee that the Pratt media contained diamond dust.

The record is clear that DeLong drew constant attention to what it considered a discrepancy in the price of media sold to Pratt, and that Washington Mills repeatedly insisted that the higher price for the Pratt media was justified. This evidence supports DeLong's assertion that it was an obstacle to the continuation of the scheme to "pad" the Pratt price, and that it was terminated to remove that obstacle.

(b) Atlanta Meetings

Harold DeLong called BCS sometime in 1983, before DeLong received its first Pratt order, and asked William Biebel for information regarding the BCS numbers on the Pratt PMCs. DeLong needed this information because the media was listed on Pratt's PMC as being manufactured by BCS, when in reality it was Washington Mills's media. When DeLong asked Biebel about these numbers, Biebel suggested that the two companies "work out an agreement between ourselves," because of BCS's development work and DeLong's proximity to the Columbus plant. (William Biebel 2d Dep. 113).

Sometime shortly after this discussion, in August 1983, Robert Biebel of BCS flew to Atlanta to meet with Harold DeLong to discuss a "mutual working arrangement" regarding Pratt, where, according to Biebel, BCS would provide technical support to Pratt and DeLong would warehouse the media. (Robert Biebel Dep. 23, William Biebel Dep. 84, 86).[20] At this meeting, Biebel told DeLong something to the effect that there was "plenty of money" in the Pratt account for both BCS and DeLong. (Robert Biebel Dep. 31, van der Sande Dep. 52). DeLong was not at all interested in

working with BCS; Harold DeLong believed he had the necessary expertise and facilities to serve Pratt himself.

In addition to the above indications from BCS, there is also evidence that Washington Mills told DeLong that the Pratt account "belonged" to BCS. (Dickey Dep. 173).

In October 1984, one day after he visited the Pratt plant with BCS principals, van der Sande met with Harold DeLong on a sales call. It was after that meeting that van der Sande stated that DeLong was "not very happy with BCS, and P & W.... Harold does not play with a full deck either.... He is not all wrong about the B.C.S. situation, long term it may not work. Bob Bieble [sic] feels we are secure for at least 3 years unless Delong [sic] does not play the game." (Pl.Ex. 194).

This statement by a BCS principal to a Washington Mills employee that BCS is concerned that DeLong might not "play the game" is evidence from which a jury reasonably could find joint action between Washington Mills and BCS regarding the termination of DeLong. Biebel's attempt to enter into an arrangement with DeLong whereby everyone could earn "plenty of money" lends further support to BCS's involvement in DeLong's termination when DeLong refused to participate in the scheme.

(c) Termination of DeLong

Genuine issues of material fact also exist with regard to the reasons for DeLong's termination. DeLong, of course, asserts that it was terminated by Washington Mills for its refusal to cooperate in the alleged illegal price fixing scheme and for being a price cutter. Washington Mills alleges that it terminated DeLong because it was behind in its payments and abusive to Washington Mills personnel.

Although DeLong does not make this argument explicitly, the thrust of its position is that the reasons Washington Mills gave for its termination of DeLong are a pretext for the actual reasons DeLong was

**20.** DeLong claims, but has adduced no evidence to support its claim, that this meeting was arranged by Peter Ford of Washington Mills. Defendants deny this.

terminated; i.e., DeLong's refusal to participate in the Pratt scheme. While such evidence standing alone would not be sufficient to show joint action in violation of the antitrust laws, "[e]vidence of pretext, if believed by a jury, would disprove the likelihood of independent action on the part of" Washington Mills. *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 474 (3d Cir. 1985). *See O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1469 (9th Cir.1986) (antitrust plaintiff must come forward with specific factual support to overcome defendant's asserted independent business justification). *Cf. H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir.1981) (mere fact that a business reason advanced by a defendant for its cutoff of a customer is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 860 (5th Cir. Unit B) (poor credit may constitute a defendant's proof that a refusal to deal was a unilateral rather than conspiratorial action), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981).[21]

A jury is entitled to determine whether Washington Mills's explanation of DeLong's termination is credible, because the facts surrounding the allegedly "abusive" behavior of DeLong employees is disputed. Dan Dickey, a DeLong salesman who allegedly was abusive toward Washington Mills personnel, testified that he was not abusive, and Harold DeLong stated that he was "shocked" to hear of allegations of abusive behavior by his employees to Washington Mills personnel. (DeLong Dep. 78–79). Washington Mills personnel, on the other hand, testified that Dan Dickey, Betty Day, DeLong's purchasing agent, and other DeLong employees were abusive to Washington Mills personnel, calling them names and using excessive profanity. Van der Sande testified that the Pratt situation "could have contributed" to DeLong's termination, but that he did not think that

was the reason. (van der Sande Dep. 94). John Williams testified that he did not consider the Pratt situation when he decided to terminate DeLong, but he did have the complaints of competing distributors in mind when he terminated DeLong.

Washington Mills's other stated reason for terminating DeLong, delinquent payments, is also in dispute. Robert Baldauf testified that he recommended DeLong be terminated for abusive behavior, but that he did not check DeLong's payment history, nor did Hans van der Sande. DeLong admits that its payment times increased as its pricing disputes with Washington Mills increased, and that DeLong was "trying to get their attention a little bit." (DeLong Dep. 90). DeLong's payment history, however, was no worse than several other Washington Mills distributors.

Termination of distributors by Washington Mills was extremely rare. Hans van der Sande testified that in his thirteen years at Washington Mills, to his knowledge only two other distributors had been terminated, one which did not buy from Washington Mills for over a year and another which did not pay its bills for eight months.

We believe that DeLong has adduced evidence which tends to exclude the possibility that Washington Mills was acting independently when it terminated DeLong. There are genuine issues of fact regarding the reasons for the termination. A reasonable jury could find that Washington Mills and BCS worked together to develop the "special" media for Pratt utilizing the contacts which BCS had cultivated at Pratt; that Washington Mills and Pratt agreed to add an artificial "pad" to the price; that both Washington Mills and BCS believed that the Pratt account belonged to BCS; that both Washington Mills and BCS attempted to get DeLong to go along with the scheme to inflate the price and share the profit, but that DeLong refused to "play the game;" that DeLong was a constant irritant and posed a risk to the scheme to "pad" the

---

**21.** This former Fifth Circuit case was decided after the close of business on September 30, 1981, and is binding precedent under *Stein v.*

*Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

price; and finally, a reasonable jury could find that there was joint action between Washington Mills and BCS in the decision to terminate DeLong in order to remove the risk which it posed to the scheme.

### 3. Defendants' Arguments

Defendants argue that Washington Mills unilaterally established its own wholesale prices and never agreed with any distributors as to the retail price to be charged by the distributor. While there is ample evidence to this effect in favor of Washington Mills, we cannot ignore the strong circumstantial evidence summarized above that Washington Mills and BCS did conspire to inflate the price of media destined for Pratt, thus agreeing that a fixed "pad" would be added to the wholesale price charged by Washington Mills and the retail price charged by BCS. Thus, there are genuine issues of fact.

 Defendants also assert that the fact that Washington Mills's personnel testified that no one discussed the termination of DeLong with anyone at BCS until after DeLong was terminated is evidence of no joint action. This argument is unpersuasive for the same reason we just stated in rejecting defendants' argument that there was no evidence of any agreement with any other distributor regarding the price of Washington Mills products. Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators. *H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981) (citation omitted), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Circumstantial evidence can establish the existence of a conspiracy in antitrust litigation. *Pan–Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 558 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). At a minimum, though, "the circumstances [must be] such

as to warrant a jury in finding that the conspirators had a unity of purpose of a common design and understanding, or a meeting of minds in an unlawful agreement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

This court must look beyond the defendants' bald denial of concerted action and analyze the substance of DeLong's evidence in order to determine whether summary judgment was appropriate. "When faced with defendants' sworn denial of the existence of a conspiracy, it is incumbent upon the plaintiff to produce significant probative evidence demonstrating that a genuine issue of fact exists as to this element of the complaint." *Pan–Islamic*, 632 F.2d at 554.

### C. Conclusion

The record contains evidence from which a reasonable jury could conclude that Washington Mills and BCS conspired to fix an inflated price for media sold to Pratt, that DeLong was not "playing the game," that therefore DeLong posed a threat to uncover the scheme, and that DeLong was terminated because of its refusal to play the game. This evidence constitutes "positive evidence which tends to exclude the possibility of unilateral action." *Helicopter*, 818 F.2d at 1534.

The record in this case is filled with disputed issues of material fact regarding a vertical price conspiracy between Washington Mills and BCS and DeLong's alleged termination pursuant to that conspiracy. Therefore, summary judgment on DeLong's section 1 claim was improper.

### III. ROBINSON–PATMAN ACT CLAIMS

 DeLong's complaint alleged that Washington Mills engaged in unlawful price discrimination in violation of section 2 of the Clayton Act, as amended by section 1 of the Robinson–Patman Act.[22] DeLong

---

**22.** Section 2 of the Clayton Act, as amended by section 1 of the Robinson–Patman Act, provides in relevant part that:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of com-

contends that Washington Mills discriminated in price by selling media of like grade or quality to others at prices lower than those offered to DeLong.[23]

The district court denied the defendants' motion for summary judgment in part and granted it in part. The court concluded that the alleged more favorable payment periods and greater discounts given to BCS by Washington Mills and the "commissions" paid by Washington Mills to BCS's offshore affiliate, Wood & Thompson, could constitute price discrimination, and thus denied summary judgment on those aspects of DeLong's Robinson–Patman claims. District Court Order 21, 24. Neither party contests that ruling on appeal. The court granted defendants' motion for summary judgment on DeLong's claim that the different prices for "stock" and "special" media constituted price discrimination under the Robinson–Patman Act. DeLong appeals this aspect of the district court's decision.[24]

The district court partially granted defendants' motion for summary judgment based on the judicially created "availability defense" as stated in *Shreve Equipment, Inc. v. Clay Equipment Corp.*, 650 F.2d 101, 105 (6th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981).[25] *See Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1038 (9th Cir.1987), *cert. granted*, —— U.S. ——, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); *Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1130 (D.C.Cir.1988); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1025–26 (2d Cir.1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

■ The availability defense is stated when, although the seller offered different

modities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered.... 15 U.S.C. § 13(a). As this court recently has reiterated, "the basic purpose of Section 2(a) of the Robinson–Patman Act is to insure that purchasers from a single seller would not be injured by the seller's discriminatory pricing policies. The complaining party must allege and prove that there were two sales made by the same seller to at least two different purchasers at different prices." *Pierce v. Commercial Warehouse, Div. of Thompson Automotive Warehouse,* 876 F.2d 86, 87 (11th Cir.1989). A Robinson–Patman plaintiff must also demonstrate some sort of competitive injury. *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 581–82 (5th Cir.1982); *M.C. Manufacturing Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1065–66 (5th Cir.1975).

**23.** In the district court, DeLong also argued that Washington Mills's infrequent sales to Pratt during the times material to this action were at lower prices than those charged to DeLong for media which DeLong resold to Pratt, an allegation of "primary line" price discrimination under the Robinson–Patman Act. The district court held that DeLong had not presented sufficient evidence of market conditions showing competitive injury, nor did DeLong show the requisite predatory intent on the part of Washington Mills. Therefore, it granted summary judgment against DeLong on those aspects of its Robinson–Patman Act claim based on Washington Mills direct sales to end-users. District Court Order 19–20, 24. DeLong does not contest this district court ruling on appeal, so we do not address those aspects of DeLong's Robinson–Patman claim. The Robinson–Patman Act claim DeLong raises before us is addressed in the text.

**24.** Defendants' brief also argues that DeLong has not demonstrated sufficient competitive injury under the Robinson–Patman Act with regard to the "special" versus stock aspect of its claims as well as on other aspects of its claims upon which the district court denied summary judgment. The district court did not reach the competitive injury question. Therefore, defendants' arguments on this point, and plaintiff's in reply, are more properly addressed to the district court in the first instance.

**25.** For purposes of this appeal, we assume but expressly do not decide whether this circuit recognizes the availability defense.

prices for the same commodity to different buyers, the lower price was available to all buyers. "Where a purchaser does not take advantage of a lower price or discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or the discrimination is not the proximate cause of the injury." *Shreve*, 650 F.2d at 105. The district court held that the price difference between special and stock media were subject to the availability defense even though Pratt would only buy "special" media marked with its PMC numbers. The court emphasized that the fact that Pratt would not accept anything but special media did not affect the availability of stock media to DeLong from Washington Mills. We believe that the district court misapplied the availability defense to the unique facts of this case.

We find *Shreve* to be distinguishable. In that case, the principal owner of Shreve was both a dealer and a territorial manager for a farm equipment manufacturer. Because he was a territorial manager, the manufacturer did not pay him the volume-based discount on sales of farm equipment that other dealers received. The court rejected Shreve's Robinson–Patman Act claim on the ground that had its owner not chosen to be a territorial manager and obtained the benefits of that position, Shreve would have received the volume discounts.

The requirement of *Shreve* that the lower price be "functionally available" negates the availability defense in this case. In this case, unlike *Shreve,* DeLong did not voluntarily forego its ability to purchase special media at the stock price; Washington Mills would not sell the media to DeLong at that price for resale to Pratt. DeLong contends that it did not have functional access to the stock price for media, because Washington Mills continually represented that the media going to Pratt was "special" and was not available for sale to Pratt via DeLong at the stock price. Because Washington Mills did not offer stock prices on the media labeled "special," the stock price was not functionally available within the meaning of *Shreve.*

The defendants contend that regardless of the difference in price between stock and special media, the stock media was available for purchase by DeLong at all times. Defendants insist that DeLong could have obtained media at stock prices for resale to Pratt if DeLong itself had only agreed to put Pratt's PMC numbers on the boxes of media. This is flatly inconsistent with defendants' assertions throughout its dealings with DeLong that special media was somehow different from stock media, and that the difference justified the higher price for media sold to Pratt. Stock media was available for purchase by DeLong, but such media could not be resold to Pratt.

Ultimately, resolution of this issue depends on whether special media and stock media are the same, i.e., are goods "of like grade and quality" within the meaning of the Robinson–Patman Act. If products are physically identical, despite differences in labeling or branding, then they are "of like grade and quality" for the purpose of stating a prima facie Robinson–Patman Act case, even though consumers may prefer a higher priced "premium" product. *FTC v. Borden Co.,* 383 U.S. 637, 643–44, 86 S.Ct. 1092, 1097, 16 L.Ed.2d 153 (1966); *see First Comics Inc. v. World Color Press,* 672 F.Supp. 1068, 1071 (N.D. Ill.1987). As we discussed in Part II *supra,* DeLong has presented substantial evidence tending to show that "special" media is identical to Washington Mills's stock product. If the products are in fact identical, and Washington Mills charged different prices to DeLong and others for them, then summary judgment on this aspect of DeLong's Robinson–Patman Act claim was improper. We therefore reverse the district court on this issue.

## IV. PENDENT STATE LAW CLAIMS

DeLong appended Georgia law breach of contract, tortious interference with business relations, and fraud claims to its complaint that the defendants violated the federal antitrust laws. The district court granted summary judgment in favor of defendants on all state law claims. We agree

with the district court that summary judgment was appropriate as to the contract and tortious interference claims, but reverse as to one aspect of the fraud claim.

## A. *Breach of Contract*

DeLong contends that the district court erred in granting summary judgment for defendants on its breach of contract claim. The district court rejected DeLong's claim under Georgia law for breach of an oral distributorship contract with Washington Mills, stating that "distributorship agreements which are not in writing are terminable at will for any cause." We, like the district court, find *West Virginia Glass Specialty Co. v. Guice & Walshe, Inc.*, 170 Ga.App. 556, 317 S.E.2d 592, 594 (1984), to be on point. In *West Virginia Glass*, the court held that where there was no written agreement between a distributor and a manufacturer and no definite time period for the distributorship, the arrangement was terminable at will by either party without contractual liability.

 DeLong correctly observes that oral contracts can be enforceable. In order for any contract to be enforced, however, it must contain definite terms. *Vitner v. Funk*, 182 Ga.App. 39, 354 S.E.2d 666 (1987); *Parks v. Atlanta News Agency, Inc.*, 115 Ga.App. 842, 156 S.E.2d 137 (1967). DeLong can point to no definite duration of the distributorship nor to any exclusive rights conferred under it, so we must reject its argument. We find no error in the district court's holding that no definite contract existed between DeLong and Washington Mills.

DeLong also argues promissory estoppel based on O.C.G.A. § 13–3–44(a), which provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." DeLong's promissory estoppel argument fails for the same reason as its contract claim—it can point to no definite promise by Washington Mills regarding the terms and duration of its

distributorship. *Loy's Office Supplies, Inc. v. Steelcase, Inc.*, 174 Ga.App. 701, 331 S.E.2d 75, 76 (1985), squarely rejects the same argument in a similar distributor termination situation. We find *Loy's* controlling on this issue. Summary judgment on DeLong's contract claims was properly granted.

## B. *Tortious Interference with Business Relations*

 DeLong challenges the district court's grant of summary judgment on its tortious interference claim. A claim based on tortious interference with business relations does not require evidence of a binding contract. *Integrated Micro Systems, Inc. v. NEC Home Electronics (USA), Inc.*, 174 Ga.App. 197, 329 S.E.2d 554, 557–58 (1985). Interference with the plaintiff's relationships with its customers, suppliers, or representatives may be actionable even though such relationships may be terminable at will. *U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.*, 717 F.Supp. 1565, 1577 (N.D.Ga.1989), *citing E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. 357, 359 S.E.2d 148, 155 (1987).

 The party charged with tortious interference must have "(1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury." *Id.*, quoting *Hayes v. Irwin*, 541 F.Supp. 397, 429 (N.D.Ga.1982), *aff'd mem.*, 729 F.2d 1466 (11th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). Interference with business relationships will be excused if it is privileged. *Orkin Exterminating Co. v. Martin Co.*, 240 Ga. 662, 242 S.E.2d 135 (1978). "[I]n order for [the defendant] to come under the protection of the competition privilege, it must establish inter alia that it did not employ improper means." *Integrated Micro Systems*, 174 Ga.App. at 202, 329 S.E.2d at 559. The privilege defense is not available where interference is achieved through actions taken in violation of a confidential

relationship. *Hayes,* 541 F.Supp. at 430; *E.D. Lacey Mills,* 183 Ga.App. at 364, 359 S.E.2d at 156.

█ It is undisputed that after Washington Mills terminated DeLong's distributorship, Washington Mills provided other distributors with DeLong's customer list and encouraged those distributors to solicit those customers' business.[26]

█ DeLong alleges that it turned over its customer list to Washington Mills in confidence, for the sole purpose of facilitating "drop shipment" of media directly to end-users. Washington Mills argues that it received the names of DeLong's customers in the ordinary course of business and that there is no evidence of any agreement that the list would be kept confidential after termination, and that its conduct following DeLong's termination therefore was privileged. We agree. Customer lists are "not within the purview of traditional Georgia law as to property and [are] not protectable from post-employment disclosure and use in the absence of contract." *Durham v. Stand–By Labor of Georgia, Inc.,* 230 Ga. 558, 198 S.E.2d 145, 149 (1973). *See Textile Rubber & Chemical Co. v. Shook,* 243 Ga. 587, 255 S.E.2d 705, 709 (1979). The record indicates no evidence of any agreement that DeLong's customer list would be kept confidential upon termination.

DeLong's reliance on *Robert B. Vance & Associates, Inc. v. Baronet Corp.,* 487 F.Supp. 790 (N.D.Ga.1979), is misplaced. In *Vance,* the customer lists at issue were treated as trade secrets, which was not the case here. 487 F.Supp. at 799. Furthermore, the competition between sellers in *Vance* occurred prior to the termination of the distributorship agreement, as opposed to this case, where the competition occurred after the distributorship was legally terminated. DeLong has presented no evidence to suggest that these contacts occurred before it was terminated nor that its business was disparaged.

The district court pointed out that the end-users of media are appropriately characterized as Washington Mills's customers as well as DeLong's customers, since the end-users are employing Washington Mills products. Washington Mills therefore has a right to solicit those customers. It is not a tort to solicit the trade of another's customers. *Parks v. Atlanta News Agency, Inc.,* 115 Ga.App. 842, 156 S.E.2d 137, 140 (1967).

We therefore reject DeLong's tortious interference claim and affirm the district court on this issue.

### C. *Fraud*

█ DeLong alleged several instances of fraud. There are five elements to a claim of fraud under Georgia law: (1) a false representation of a past or present fact; (2) scienter; (3) intention to induce the plaintiff to commit an act or refrain from committing an act; (4) reliance; and (5) damage. O.C.G.A. § 51–6–1; *Parsells v. Orkin Exterminating Co.,* 172 Ga.App. 74, 322 S.E.2d 91 (1984). The district court granted summary judgment in favor of defendants. We believe that the district court improperly granted summary judgment on one aspect of DeLong's fraud claim.

█ DeLong alleged that Washington Mills's deceptive labeling of special media constituted fraud. The court found no justifiable reliance, because DeLong was aware of the falsity of the representation, citing *Blanchard v. West,* 115 Ga.App. 814, 156 S.E.2d 164, 166 (1967); *Gaultney v. Windham,* 99 Ga.App. 800, 109 S.E.2d 914 (1959). Those cases stand for the proposition that a fraud plaintiff must have used due diligence in attempting to establish the truth or falsity of a defendant's assertions. Where the plaintiff repeatedly confronts the defendant with the apparent falsity of its representations, and the defendant repeatedly confirms its original statement,

---

**26.** DeLong's tortious interference claim has another aspect, namely that the very act of termination by Washington Mills constituted tortious interference because DeLong could no longer provide its customers with Washington Mills media. Because Washington Mills was free to terminate DeLong, *see supra,* any negative effect on DeLong's business resulting from that termination cannot constitute tortious interference. *West Virginia Glass,* 317 S.E.2d at 594.

**1520**

asserting special knowledge, reliance is justified. *Georgia–Carolina Brick & Tile Co. v. Brown*, 153 Ga.App. 747, 266 S.E.2d 531, 539 (1980).

The due diligence requirement "does not go so far as to require the exhaustion of all available means to ascertain the truth of the representations," but demands only reasonable care, which is a jury question. *Gibson v. Home Folks Mobile Home Plaza, Inc.*, 533 F.Supp. 1211, 1216 (S.D.Ga.1982). As discussed above, we believe that DeLong has demonstrated a genuine issue of fact as to whether special media was in fact identical to stock media. Washington Mills's repeated assertions to the contrary raise a jury question as to fraud. We therefore reverse the district court's grant of summary judgment on this aspect of DeLong's fraud claims.

DeLong raised other fraud claims, which the district court rejected because the alleged frauds referred only to future events and therefore are not actionable. *Lanham v. Mr. B's Oil Co.*, 166 Ga.App. 372, 304 S.E.2d 738, 739 (1983). DeLong argues that Washington Mills's conduct falls within the exception for promises regarding future events made with the present intention not to perform, but points to no specific evidence to support this claim of Washington Mills's present intention. DeLong's arguments on appeal concerning these other fraud claims thus are without merit, and the district court appropriately granted summary judgment on those claims.

## V. CONCLUSION

In summary, we hold that summary judgment was improperly granted on De-Long's allegation of a vertical price conspiracy by the defendants in violation of section 1 of the Sherman Act. We further hold that summary judgment was improper on the Robinson–Patman Act claim raised by DeLong on appeal. With regard to the state law issues, we affirm the decision of the district court granting summary judgment on DeLong's contract and tortious interference with business relations claims, but reverse as to the fraud claim which

centers on Washington Mills's representations concerning special and stock media.

AFFIRMED in part, REVERSED in part, and REMANDED.