Diane WILLIAMS, Plaintiff,

v.

State of ALABAMA, Department of Corrections and Michael Haley, Defendant.

Civil Action No. 02–M–1382–N.

United States District Court, M.D. Alabama, Northern Division.

Feb. 12, 2004.

Jerry D. Roberson, Roberson & Roberson, Birmingham, AL, for Plaintiff.

Andrew W. Redd, Jane Lecroy Brannan, Asst.Gen.Counsel, Montgomery, AL, for Defendant.

## ORDER

McPHERSON, United States Magistrate Judge.

The plaintiff, Diane Williams ["Williams"], filed this civil action on 18 December 2002 against the Alabama Department of Corrections ("DOE")(Doc. # 1, Compl.). Williams has asserted state and federal allegations in violation of 42 U.S.C.2000 et. seq. and has requested a jury trial pursuant to 42 U.S.C.1981a (Doc. # 1). She invokes this court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, 2202; 42 U.S.C.2000(e) et seq; and 28 U.S.C.1983 (Doc. # 1). She seeks an injunction as well as compensatory and punitive damages.

The defendants filed a motion for summary judgment on 5 January 2004 (Doc. # 34), and the plaintiff filed her brief in opposition to the motion on 20 January 2004 (Doc. # 38) Upon consideration of the defendants' motion, the plaintiff's response, the evidentiary record, and for the reasons stated in this order, the defendants' motion for summary judgment is DENIED.

## I. FACTS

Williams asserts claims of a hostile work environment and retaliation against the Alabama Department of Corrections ["DOC"] (Doc. # 1). The allegations in the EEOC charge and in the complaint describe an institutional and systemic pattern of sexual harassment at the state's correctional facilities. Although Warden Jones appears to have been the impetus for Williams' complaint, her allegations involve either acts or omissions by wardens and other high-ranking officials within the DOC.

Williams has worked for the Alabama DOC since 1978 (Doc. # 38). For the first three years, she worked at Holman Prison ["Holman"]. During her first year, she was a clerical typist (Plaintiff's Exhibit 2, Affidavit of Diane Williams, p. 1). In 1979, she was promoted to the position of secretary to Holman Warden Joe Oliver ["Warden Oliver"] (*Id.*). Warden Oliver's assistant warden was Charles Jones, ["Warden Jones"], Williams' alleged harasser. Williams contends that she was sexually harassed by Jones in 1979 and 1980 while they worked at Holman (*Id.*). She reported the incidents to Warden Oliver (*Id.*). In 1980, Williams transferred to the Fountain Correctional Facility ["Fountain"] (*Id.* at pp. 1–2)., and shortly thereafter, Warden Jones and Warden Oliver both transferred to Staton and Staton Annex. Williams' desire to transfer was caused by Jones' harassment, which Williams described as follows:

> [Jones'] harassment included unwanted, unwelcomed, and improper touching by Jones of my neck, shoulders and chest. Jones made sexual advances to me, telling me that "doesn't this feel good" and "that I did not know what I was missing." I rebuffed Jones' advances. I reported this harassment to Warden Oliver in 1980. Oliver met with Jones about my complaint, and after the meeting, Oliver told me that I was just "young, naive, and very green." After my complaint, Jones stopped touching

me but continued to retaliate against me.

(Plaintiff's Exhibit 2, Williams Affidavit, p. 2). In 2000, while Williams was still working at Fountain, she learned that Jones had been named warden at Fountain. She advised Jerry Ferrell ["Ferrell"], Fountain's deputy warden, of her fear that Jones would retaliate against her.

Jones denies any sexual harassment of or retaliation against Williams or anyone else in the DOC (Jones Deposition, pp. 14–15).[1] He contends that he was not aware that Williams made a claim of sexual harassment against him at any time (See footnote 1, *infra),* even though another female employee of the DOC, Deborah Sanders–Manasco ["Sanders–Manasco"] also contends that Jones sexually harassed her as well (Plaintiff's Exhibit 18, Affidavit of Deborah Sanders–Manasco). Jones also denies harassing Sanders–Manasco (Jones Deposition, p. 55).

Sander–Manasco's sworn statement is a detailed one. She contends that, within weeks of beginning her employment as a Classification Specialist at Staton and Staton Annex,

> Mr. Jones began making improper and offensive sexual advances towards me that made me very uncomfortable. Initially there were looks, stares, winks, and mouth gestures. Later he began telephoning me at my desk at work and at my home to talk about personal matters unrelated to my work. At first we discussed things of a general nature such as college, law school, horses, children, parents, etc., then the conversations shifted focus and became centered around sexual matters such as physical appearances, breast and penis sizes, and dirty jokes filled with sexual slurs and innuendos. When it became too uncomfortable for me to tolerate, I reported it to Dr. Friesen who suggested that I discuss it with the warden. I reported Mr. Jones's behavior to Mr. Sutton and was told not to worry because "That's just Charlie" and nothing was meant by it. I informed Mr. Sutton that Jones's behavior made me very uncomfortable and created stress. I was told that I was young, a new and inexperienced employee, that I should get used to it, and learn to laugh it off because females working in men's correctional facilities had to accept this type of conduct in return for the privilege of the employment.

*(Id.).* In fact, according to Sanders–Manasco, Jones' harassment did not end after she reported it to Warden Sutton.

> I was repeatedly and continuously subjected to sexual advances from Mr. Jones which were demeaning and disconcerting. I tolerated his advances as best I could in order to keep my job since Mr. Jones was my superior. I had

1. Q: In the thirty-two years that you worked at the Department of Corrections, were you ever disciplined for any claim of sexual harassment?

A: No.

Q: Have you ever been investigated for any claim of sexual harassment other than Diane Williams?

A: No.

Q: Were you investigated for her claim of sexual harassment?

A: No.

Q: In 1979, was the warden at Holman Prison a Mr. Oliver?

A: Yes, Joe Oliver.

Q: Do you recall Ms. Williams making a complaint to then Warden Joe Oliver that you had made inappropriate sexual advances toward her by massaging her or groping her?

A: No.

Q: You deny she ever made that complaint?

A: I didn't-well I misunderstood your question. If she did, Mr. Oliver never said anything to me about it.

Q: You certainly weren't disciplined for it, correct?

A: No.

no one to call upon for financial assistance. I was self-supporting and paying my way through school so I needed the job ... I was and continue to be very ashamed of tolerating his sexual advances but never believed I had no choice under the circumstances of my life at that time.

(*Id.*) Sanders–Manasco's statement relates a series of harassing acts by Jones, followed by a series of unsuccessful complaints and retaliation.[2]

Within months of Jones' arrival at Fountain in 2000, he began harassing Williams again. Williams complained that Jones was attempting to reduce her duties in a manner similar his reduction of Belinda Hicks' duties[3] in retaliation for her sexual harassment complaint against him.[4] In fact, Williams contends that Jones issued a

2. 7.... I discussed the harassment with Dr. Thompson as a psychologist and as my direct supervisor. *He advised me that there wasn't much I could do about it since this type behavior occurred frequently in the department.* He advised me that if I complained too loudly or to the wrong person my employment would probably be terminated or I would be forced to quit and sacrifice a job I loved and any chances for a career in state government. *He told me to consider the shame and humiliation as part of the price I had to pay to reach my goal to get my education and become an attorney for the state* (Emphasis added).

8. Mr. Jones' s continued sexual aggression became more forceful. Our conversations became more intrusive, filled with coercive sexual inquiries and demands. He pressured me for exact directions to my home. I feared for my safety and security regardless of whether I told him the truth. He became more bold and would put his arm around me if he caught me alone anywhere. He would walk behind me at my desk and place his hands on my shoulders. He would try to run his hands from my shoulders down the front of my chest and I would move from the chair to avoid him. I was repulsed by his sexual aggression yet horrified to reject him. I became so distressed that I risked my job again by reporting the problem of the offensive sexual advances to the warden. Mr. Bowen was sympathetic but said that he could not do anything about it if I wanted to keep my job and have a career. He indicated that a new temporary prison would open soon and suggested that I transfer to help open the new prison and to get away from Mr. Jones ... I was assured that [Mr. Bowen] would ne discreet about the reason for my transfer so I requested the transfer and was approved.

17.... When I reported the behavior to numerous superiors while it was ongoing, I was repeatedly told not to put anything in writing about this and that there was no grievance procedure for these matters since it did not involve my work, performance evaluations, promotions or pay raises ... Rather than take any corrective action, department officials and my superiors pressured me to keep my mouth shut about it. I am ashamed that I remained quiet in order to keep my job and complete my education.
Plaintiff's Exhibit 18, Affidavit of Manasco.

3. .... I formerly worked at Holman Prison as Warden's Secretary and worked for C.E. Jones, Warden. I was either involved in or witnessed the following incidents while working for C.E. Jones.

In the matter of Belinda Hicks, Personnel Assistant I, I typed all memos transposed by Warden Jones in which her duties were taken from her. Also, when Ms. Hicks filed a grievance concerning her situation, Warden Jones made the following statement to me: "who does she think she is. I'm the master fucker. Nobody fucks with me, I fuck with them."
(Plaintiff's Exhibit 21, Affidavit of Rebecca Raines, p. 1).

4. My name is Belinda Hicks ... During some periods of my employment at Holman, I worked under the supervision of Warden Charles E. Jones. Mr. Jones repeatedly made comments that were of a sexual nature and were completely inappropriate for the work place. He frequently made comments about the size of women's breasts. On one occasion, Mr. Jones bragged to me about how he had replaced a previous secretary who was on maternity leave. He stated that when she

directive that eliminated her ability to communicate with supervisors, based on the management of an incident stemming from a 22 August 2000 conversation she had with Jones about an employee's leave.

Consistent with that testimony, Warden Ferrell, a 23–year DOC veteran at Fountain, (Ferrell Deposition, p. 8), provided the following description of Williams' responsibilities as a personnel assistant:

> Payroll, submit payroll, to keep up with leave, employee leave balances, to keep up with military leave actions, and other personnel actions as deemed appropriate or as directed by the Warden. To keep personnel files on all employees at the institutional level. Putting information in their files that's forwarded to her.

(Ferrell Deposition, p. 15). Ferrell also stated that he was unaware of any discipline imposed on a warden for sexual harassment (Ferrell Depostion, p. 19).

On 30 August 2000, Williams filed a formal complaint against Warden Jones with Ferrell. When asked the nature of her complaint, she wrote:

> On 8–29–00, Warden Ferrell advised me per instructions from Warden Jones that I could not be in contact with supervisors in addressing employee time sheets and leave discrepancies ... I expressed concern that I could not effectively do my job if I could not personally communicate with supervisors. In my respon-

sibilities/results on my employee performance appraisal, I am graded each year on two responsibilities ...

> # 1. Communicates information/data in writing and orally so that [ ][sic] information is furnished on an as needed or as required basis courteously and in the time frame required to assure that there is a positive flow of information.

> # 2. Gathers and/or provides information to individuals so that information gathered will be accurate without delay.

> Therefore, I feel that I am being unlawfully harassed leading to conduct that tends to create an intimidating, hostile, or offensive work environment, and such conduct has the purpose or affect of unreasona[b]ly interfering with my work performance.

> I believe that this unlawful harassment is stemming from an incident of sexual harassment that occurred 20 years ago where there was sexual harassment by Warden Jones to me.

(Plaintiff's Exhibit 6, Diane Williams Grievance).

This grievance was given to the DOC's EEO Officer, Lori Walker ["Walker"]. In response to Williams' grievance, Commissioner Hardison and Walker issued a memorandum to her via certified mail on 20 September 2000 that read, in pertinent part:

returned to work from maternity leave, "she thought she could rub her big tits on me, and everything would be okay" ...

> Mr. Jones instructed me to forward a note to a former co-worker, Donna Phillips. The note was not signed but the gist of the message was that the author would like to have sex with Ms. Phillips. The note was very crude and sexually explicit. It had been written as if it was from an inmate and not the warden.
> I had made complaints about Mr. Jones to commissioners, Ron Sutton and Paul Her-

ring, in Montgomery. When I went to meet with them concerning Mr. Jones, Mr. Jones was in their office. Mr. Jones disciplined me in several ways, first by putting a letter of reprimand in my file. He also lowered my evaluation. He told me that if that didn't work, then he would suspend me and fire me. Mr. Jones basically took my job away, requiring me to train Yvonne Jennings and Paulette Godwin to do my duties. (Plaintiff's Exhibit 20, Affidavit of Belinda Hicks, pp. 1–2).

As you know, the Alabama Department of Corrections (ADOC) is firmly committed to providing a work environment that is free of discrimination. The ADOC maintains a strict policy prohibiting all forms of unlawful harassment, including sexual harassment.

After an investigation into your grievance, a remedy to this matter has been granted. The final decision with the ADOC is as follows:

- The memorandum dated August 30, 2000 has been rescinded. Your duties have been reinstated. We encourage you to exercise courtesy and tact when meeting with supervisors. If after attempting to resolve time sheet and/or other leave form matters with institutional supervisors, and there are still concerns, you will notify your immediate supervisor, Patrick McKay for assistance.

**Again, a remedy to this matter has been granted and this decision is final within the ADOC** (Emphasis added).

(Plaintiff's Exhibit 7, DOC Response to Williams' Grievance).

Warden Jones was copied on this letter (Plaintiff's Exhibit 7, DOC Response to Williams' Grievance, p. 2). Between the time Williams filed her complaint and the time DOC responded, Jones issued a memo to Williams' immediate supervisor, Patrick McKay, regarding "Cross Training of Personnel Assistant I Duties" (Plaintiff's Exhibit 8, Memo from Jones to McKay). The memo stated, "This is your authorization to coordinate and make arrangements for the cross training of Sharon Stansbury in the GHRS duties of Personnel Assistant 1 Ms. Diane Williams" (Plaintiff's Exhibit 8, Memo from Jones to McKay). Sharon Stansbury worked as Jones' secretary at the time.

Although Jones insists that he was not aware of Williams' complaint against him on 18 September 2000—just two days before he was copied on a memo to Williams from Commissioner Hardison and Walker—he wrote to Commissioner Hardison:

I would like to suggest that you, in your official capacity as Deputy Commissioner and Grievance Officer, immediately request a formal investigation into allegations, false allegations I might add, being made against me by Personnel Assistant, Diane Williams.

In addition to any investigation, I think my background should be thoroughly looked into in order to refute the claims she is making against me.

(Plaintiff's Exhibit 10, Jones Memo to Hardison).

Ferrell, an Assistant Warden at Fountain, had worked under Warden Jones. Ferrell has acknowledged an awareness that other women (prior to Williams) had complained of sexual harassment and/or retaliation, either by Jones or with Jones' knowledge (Ferrell Deposition: 35, 36, 42, 43)[5]. Although Ferrell acknowledges that

5. Q: Now, before Ms. Williams shared with you, confided in you about her concerns about Warden Jones, and before her complaint in August, had you been made aware from any source that any female had ever had any problem working with Warden Jones?

A: There was a lady, a couple of ladies when I was at Holman that had some issues.

. . . . .

A. A Ms. Belinda Hicks was having some problems, and she was a personnel assis-

tant, if I'm not mistaken. Ms Marilyn Gorham had some issues.

Q: Now you also mentioned a correctional officer Gorham. Do you recall anything about the nature of her complaint with Warden Jones?

A: I don't know if she ever made complaint. I know she had a problem because she was off on FMLA and was about to come back on—was about to retire. And she was sent a letter, something about the fact that if you

he does not like Warden Jones because of personal issues associated with Ferrell's wife (Ferrell Deposition: 40), Ferrell was intimately familiar with Williams' claims.

Williams was not satisfied with the DOC's disposition of her claim. She filed a charge with the Equal Employment Opportunities Commission ["EEOC"] prior to bringing an action in federal court. Her charged alleged harassment and retaliation against her by Jones on 4 October 2000 (Plaintiff's Exhibit 29). The claims in her charge are consistent with those in this lawsuit:

> I believe that I have been discriminated against because of my sex, female, my disability and in retaliation for having opposed practices unlawful under Title VII of the Civil Rights Act of 1964, as amended. *The Warden [Jones] has established a pattern during his career of sexual [sic] harassing female employees, to include harassing and intimidating other female employees* (Emphasis added).

(Plaintiff's Exhibit 29, Plaintiff's charge of discrimination before the EEOC).

The DOC responded to the EEOC on 14 November 2000 by refuting all charges of harassment and retaliation advanced by Williams.[6]

In response to Williams' charge, the EEOC issued a response on 3 April 2001:

*I find that Charging Party and other female employees were targets of sexual harassment and retaliation by a Respondent prison warden. Respondent was aware of the unlawful conduct by the warden and failed to take appropriate remedial action to remedy the situation, in violation of Title VII* (Emphasis added).

(Plaintiff's Exhibit 28, EEOC Cause Finding).

## II. DISCUSSION

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant either by submitting affirmative evidence negating an essential element of the nonmovant's claim or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element

---

don't bring a doctor's excuse within so many days we'll consider you terminated from your job. And she called real upset and she spoke to me and she said, he knows I'm going to retire, he already has my paperwork, why are ya'll sending me a letter.

**6.** This letter constitutes the response of the Alabama Department of Corrections (ADOC), (Respondent) to the above-referenced complaint of sexual harassment, retaliation, and disability filed by Diane Williams, (Charging Party), see copy at Enclosure 1. The Charging Party (CP)'s charges based on sexual harass-

ment, retaliation and disability are unsubstantiated. Due to the allegation occurring over twenty years ago, the ADOC is unable to respond with specificity to this allegation. The ADOC denies that the alleged sexual harassment occurred and that the unnamed Warden was transferred from Holman Prison due to the alleged harassment. The alleged retaliation resulting from the alleged sexual harassment is also unsubstantiated. The ADOC has no knowledge of a disability, the existence of a disability claim or a request for accommodation from the CP.(Plaintiff's Exhibit 30).

to her claims, and on which she bears the burden of proof at trial. To satisfy this burden, the nonmovant cannot rest on her pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). If the nonmoving party does not respond to a motion for summary judgment, the court may grant a motion for summary judgment in favor of the moving party, if defendant's presentation is sufficient to justify court's conclusion. *Id.*

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also De Long Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V/ Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**B. Genuine Issues of Material Fact**

Williams alleges that her civil rights were violated pursuant to Title VII, be-cause she was subjected to a hostile work environment (Doc. # 38, pp. 16–18). She also alleges that her civil rights were violated because she was retaliated against for filing a claim against the DOC with the EEOC (Doc. # 38, pp. 29–36).

In response to Williams' contentions, the defendant has asserted the following:

1. The employment action taken by Jones was not adverse and did not substantially alter the condition of employment (Doc. # 35, p. 2).

2. No reasonable person would perceive the work environment at Fountain in 2000 to be sexually hostile or abusive. (Doc. # 35, p. 2).

3. Jones had legitimate, non-discriminatory reasons for the employment action he took regarding Williams, and the action taken was not adverse to her (Doc. # 35, p. 2).

4. The DOC acted reasonably and promptly to prevent and correct any sexual harassment (Doc. # 35, p. 3).

5. Commissioner Haley did not condone or permit systemic sexual harassment or hostility in the work environments of the DOC (Doc. # 35, p. 3).

Williams alleges that she was subjected to a hostile work environment, and she suffered retaliation for filing an internal EEO claim and as well, an EEOC claim against the DOC when it failed to take action regarding her report of hostility in the workplace that stemmed from previous sexual harassment (Doc. # 38). DOC refutes both of these contentions (Doc. # 35). Williams advanced a number of examples, ascertained from a number of women other than herself, in support of her contentions. Further, she provided evidence of DOC's impropriety in handling these inci-

dents through corroborative reports of two DOC employees, Walker and Ferrell.

The DOC submitted sworn testimony from others, including Former Fountain Warden Charles Jones, DOC Deputy Commissioner Ed Hardison, Former DOC Commissioner Michael Haley, and Fountain Business Manager J. Patrick McKay, in an attempt to rebut the claims advanced by Williams.

After reviewing these records, the court finds that the facts of this case are in substantial dispute. Thus, there are a number of genuine issues of material fact remaining that preclude a finding, at this juncture, that Williams can allege no set of facts to establish her claims. Of particular concern to the court are: (a) whether the DOC's internal investigation and resolution of Williams' complaint against Jones was sufficient; (b) whether the employment action taken per Jones' request, both prior and subsequent to DOC's decision to reinstate certain duties, substantially altered Williams' conditions of employment; and if so, (c) whether Jones had a legitimate nondiscriminatory reason for the employment action that he took against Williams; and (d) whether the evidence of record supports a hostile work environment.

As to all of these issues, there is a material factual dispute. Williams vigorously asserts facts supporting her claims, while the DOC vigorously asserts facts to refute them. For that reason, the court has concluded that the defendants' motion for summary judgment should be DENIED.

## C. Legal Argument and Analysis

### 1. Sexual Harassment Hostile Work Environment

To establish a hostile environment sexual harassment claim under Title VII of the Civil Rights Act of 1964 based on harass-

ment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999). Williams, as a female, is a member of a protected group. She claims that she was sexually harassed while the DOC advances the contention that she was not. Based on the evidence of record, the court is not able to ascertain the truth of these polarized allegations. And even if the court were able, it would be inappropriate, because the record is replete with instances of controverted facts from the parties, thereby presenting a genuine issue that must be decided by finders of fact.

## III.  CONCLUSION

Accordingly, it is ORDERED that:

1. The motion for summary judgment is DENIED as to Williams' hostile work environment claim.

2. The motion for summary judgment is DENIED as to Williams' retaliation claim.

3. This case will now proceed to trial on the claims as to which the motions have been denied.